[909 NE2d 1229, 882 NYS2d 392]

ROBERT CALLAHAN et al., Appellants, v HUGH L. CAREY, as Governor of the State of New York, et al., Defendants, and EDWARD I. KOCH, as Mayor of the City of New York, et al., Respondents.

LOUISE F. ELDREDGE et al., Appellants, v EDWARD I. KOCH, as Mayor of the City of New York, et al., Respondents.

Argued May 6, 2009; decided June 4, 2009

## POINTS OF COUNSEL

*Legal Aid Society,* New York City (*Steven Banks, Amanda Moretti* and *Amy Mulzer* of counsel), for appellants. I. The Appellate Division incorrectly held that the consent decree does not require the City of New York defendants to provide plaintiffs' counsel with copies of shelter termination sanction notices when issued to homeless individuals. (*19th St. Assoc. v State of New York,* 79 NY2d 434; *People v Giles,* 11 NY3d 495; *United States v O'Rourke,* 943 F2d 180; *United States v Armour & Co.,* 402 US 673.) II. Absent continued provision of shelter termination sanction notices to plaintiffs' counsel, vulnerable homeless women and men will be at risk of grave harm.

*Michael A. Cardozo, Corporation Counsel,* New York City (*Alan G. Krams, Leonard Koerner, Thomas C. Crane* and *Kristin M. Helmers* of counsel), for respondents. The Appellate Division correctly applied its earlier decision that an erroneous sanction would not violate the rights secured by the consent decree. (*Baker v Shepard,* 276 AD2d 873; *Jones v 30 Sutton Place Corp.,* 12 AD2d 455, 10 NY2d 771; *Goldberg v Kelly,* 397 US 254; *Frew v Hawkins,* 540 US 431; *Matter of Barie v Lavine,* 40 NY2d 565.)

**OPINION OF THE COURT**

READ, J.

On October 2, 1979, plaintiff Robert Callahan and other homeless men living in New York City brought a class action challenging the sufficiency and quality of shelter made available to them. Plaintiffs were represented by the Legal Aid Society. Defendants were the Governor of the State of New York at the time, Hugh L. Carey, and his Commissioner of Social Services (the State defendants); and the Mayor of New York City at the time, Edward I. Koch, his Commissioner of the Human Resources Administration (HRA) and his Director of the Shelter Care Center for Men (the City defendants). The parties subsequently resolved this lawsuit with a "FINAL JUDGMENT BY CONSENT" dated August 26, 1981; in 1983, this consent decree was extended to cover homeless women living in the City (*see Eldredge v Koch*, 98 AD2d 675 [1st Dept 1983]).

Paragraph 1 of the decree specifies that

> "[t]he City defendants shall provide shelter and board to each homeless man who applies for it provided that (a) the man meets the need standard to qualify for the home relief program established in New York State; or (b) the man by reason of physical, mental or social dysfunction is in need of temporary shelter."

Paragraph 11—which is key to this appeal—states in its entirety that "[p]laintiffs' representatives shall have full access to all shelter facilities, central intake centers and satellite intake centers, and *plaintiffs' counsel* [the Legal Aid Society] shall be provided *access to any records relevant to the enforcement and monitoring of this decree*" (emphasis added).

In addition, paragraph 10 directs the Commissioner of HRA to "appoint qualified employees with no administrative responsibility for providing shelter to monitor [the City defendants'] shelter care program . . . with respect to compliance with [the] decree"; and make twice monthly written reports to the Commissioner, which "shall be made available to [the Legal Aid Society] upon reasonable notice." Paragraph 12 requires the City to hand-deliver to plaintiffs' counsel each day a compilation of five categories of information.[1] Finally, paragraph 19 places continuing jurisdiction in Supreme Court

---

1. The categories are (1) the number of men who applied for shelter at each central and satellite intake center; (2) the number of men provided

"for the purpose of enabling any of the parties . . . to apply to [the court] at any time for such further orders and directions as may be necessary or appropriate for the construction, modification, or termination of this entire judgment or of any applicable provisions thereof, for the enforcement of compliance therewith, and for the punishment of violations thereof."

In 1995, the New York State Department of Social Services (DSS)[2] promulgated regulations authorizing local social services districts, like the City, to evict individuals from shelters for refusing to take certain steps toward self-sufficiency, or engaging in misconduct in the shelter facility (for example, violence, drug-dealing, or repeated violations of the shelter's rules) (*see generally* 18 NYCRR 352.35). Shelter residents unable to comply with the regulations' requirements because of a physical or mental impairment were not subject to eviction (18 NYCRR 352.35 [c]). A shelter resident who received a sanction notice was entitled to a fair hearing conducted by DSS (now by OTDA) (18 NYCRR 352.35 [h]), and continued housing until the fair hearing decision was rendered (18 NYCRR 358-3.6). The sanction of eviction, once imposed, lasted "until the failure [to comply] cease[d], or for 30 days, whichever period of time [was] longer" (*see* 18 NYCRR 352.35 [c] [2], [3], [4]).

Plaintiffs sought to enjoin implementation of the regulations, arguing that they conflicted with the consent decree. Supreme Court agreed, but the Appellate Division did not. As the Appellate Division put it,

"nothing in the decree . . . provides or even suggests that the defendants undertook to provide shelter unconditionally, indefinitely or regardless of need. The decree does not preclude the adoption of reasonable standards intended to assure that temporary shelter is provided only to those who

---

shelter at each shelter facility or hotel; (3) the number of men denied shelter at each shelter facility or central or satellite intake center and the reason for the denial; (4) the number of men accepted for shelter at each central or satellite intake center who did not reach a shelter facility; and (5) the number of men provided transportation from each satellite intake center to a shelter facility.

2. In 1997, DSS was renamed the Department of Family Assistance, and its functions were transferred to two autonomous offices (*see* L 1997, ch 436, part B, § 122 [a]), one of which—the Office of Temporary and Disability Assistance (OTDA)—regulates shelters for adults (*id.* § 122 [f]).

actually need it" (*Callahan v Carey*, 307 AD2d 150, 153 [1st Dept 2003] [*Callahan I*], *lv dismissed* 100 NY2d 615 [2003]; *see also McCain v Giuliani*, 252 AD2d 461, 462 [1st Dept 1998], *lv dismissed* 93 NY2d 848 [1999] [addressing shelter eligibility, court determined that section 352.35 was "rationally related to (DSS's) legitimate rulemaking objective of assuring that temporary housing resources are not squandered on those having no real need of them and to the related, equally legitimate objective of attempting to reduce prospective reliance upon temporary housing provided at public expense"]).

In sum, the decision in *Callahan I* allowed the City defendants to implement the DSS regulations without modifying the decree.

As explained by the Deputy Commissioner of the New York City Department of Homeless Services (DHS), by the time *Callahan I* was decided in 2003, the 1981-era deficiencies in access to decent shelter which the decree was meant to fix had, in fact, been substantially remedied. This freed up DHS to focus on developing extensive programs—including one dubbed the "Client Responsibility" initiative—designed to "shift from managing homelessness to ending chronic homelessness altogether."[3] The sanction regime is an integral part of these programs.

DHS's sanction notice is a two-page document, which includes at the top of the first page the sanction's effective date (10 days after the shelter resident's receipt of the notice), and states the reasons DHS is seeking eviction. The right and time (within 60 days of receipt) to ask for a fair hearing to contest eviction is described; further, the resident is informed that, if a hearing is requested before the sanction's effective date, shelter will continue until OTDA's decision after hearing. Page two of the notice includes a paragraph, labeled "LEGAL ASSISTANCE," which advises the resident that free legal assistance may be available "by contacting [the] local Legal Aid Society or other legal advocate group." The Legal Aid Society's toll-free telephone number is listed, along with telephone numbers for the Urban Justice Center and Coalition for the Homeless.

In the spring of 2005, plaintiffs asked Supreme Court for an order directing DHS to furnish the Legal Aid Society with

---

3. For example, the record discloses that in City Fiscal Year 2005, 5,892 single homeless men and women moved from shelters into long-term housing.

copies of sanction notices.[4] Plaintiffs took the position that the notices were "records relevant to the enforcement and monitoring" of the consent decree to which the Legal Aid Society was promised "access" by paragraph 11. The Legal Aid Society's receipt of the notices, plaintiffs argued, would protect homeless individuals from erroneous eviction, thereby safeguarding their right under the decree to shelter. The City defendants countered that the decree governed the capacity and physical conditions of the City's shelters, not individual sanction determinations. In addition, they contended, the Appellate Division had effectively decided against plaintiffs' access to sanction notices in *Callahan I*, which rejected the notion that DSS's regulations affected rights guaranteed the homeless by the decree.

On November 8, 2006, Supreme Court issued a decision granting plaintiffs' motion on the ground that the consent decree required the City defendants to provide the sanction notices to the Legal Aid Society "when issued" to shelter residents (13 Misc 3d 1241[A], 2006 NY Slip Op 52203[U], *3). The court determined that the City defendants' claim that paragraph 11 only committed them to furnish the Legal Aid Society with records relevant to the sufficiency and quality of shelter was "undercut" by other sections of the decree; specifically, paragraph 12, which "appears to relate to individuals, who when seeking or applying for shelter (as opposed to those whose shelter was being terminated), were denied it, and does not relate merely to the sufficiency and quality of shelter, but rather to the denial of shelter" (*id.*). Noting that the City defendants had "taken many commendable steps" to insure shelter for homeless individuals, Supreme Court additionally observed that "human error is inevitable and the risk of harm is too great to ignore in this population which contains many vulnerable individuals" (*id.*). The City defendants appealed.

The Appellate Division, with one Justice dissenting, reversed Supreme Court's decision and order. In general, the majority declined to read paragraph 11 "so broadly as to impose an obligation on the City to provide sanction notices to the Legal Aid Society when residents are noticed" (*Callahan v Carey*, 53 AD3d 404, 405 [1st Dept 2008]), while the dissenting Justice

---

4. The City defendants agreed to provide the first five notices to the Legal Aid Society. After plaintiffs moved for the order at issue in this appeal, this practice continued, first by court request, then by interim court order. Between late 2003 until the record closed in this case in 2006, DHS apparently issued only 24 sanction notices.

considered such notices to be "relevant" to the decree's enforcement within the meaning of paragraph 11. The Appellate Division subsequently granted plaintiffs' motion for leave to appeal, asking us whether its order "which reversed the order of the Supreme Court, [was] properly made?" We now reverse, and so answer in the negative.

A consent decree "is in the nature of a contract" (*see 19th St. Assoc. v State of New York*, 79 NY2d 434, 442 [1992]), which we must interpret in light of its plain language. And here, paragraph 11 is broadly worded—it gives the Legal Aid Society "access to *any* records *relevant* to the enforcement and monitoring of [the] decree" (emphasis added). We simply cannot say that sanction notices are irrelevant to the City defendants' compliance with their obligation under the decree to provide decent shelter for homeless adults. As the dissenting Justice in the Appellate Division pointed out, it is at least *theoretically* possible for the City defendants to evade the decree's requirements through improper mass evictions. No one suggests that DHS has ever contemplated such a thing, but paragraph 11 specifies only that records must be "relevant" to enforcing and monitoring the City defendants' commitments under the decree. This is not a high hurdle to clear. We also note that if, as the City defendants argue, they only undertook to supply plaintiffs with aggregate data relating to the sufficiency and quality of shelter, paragraphs 10 and 12 alone would seem to have been sufficient to fulfill this purpose. Instead, the parties also included the catchall language in paragraph 11.

The City does not complain that the provision of sanction notices to the Legal Aid Society imposes any administrative burden, or in any way goes beyond the "access" guaranteed by paragraph 11, which arguably might be granted in ways other than by copying the Legal Aid Society with notices simultaneously upon their issuance to recipients. Indeed, the City defendants concede that "[t]his dispute . . . might seem small." They maintain, however, that the appeal "raises a larger question. A lawsuit settled 27 years ago with a consent judgment that resolved a different controversy should not be expanded into a vehicle for ongoing judicial oversight of other programmatic changes in the City's adult shelters"; and "[t]he governments that signed the Decree assumed complex and expensive obligations, but did not agree to ongoing judicial oversight of other aspects of shelter operations." While these pleas carry force, there are several responses. First, paragraph 11 only

requires the City to make certain records available to the Legal Aid Society; it does not mandate "judicial oversight" of DHS's implementation of its Client Responsibility initiative or section 352.35 of the regulations. Second, as already noted, the parties themselves—for reasons no doubt good and sufficient at the time—negotiated expansive language in paragraph 11. Finally, to the extent that the City defendants consider the consent decree to be outmoded and cumbersome, they may always seek to modify or terminate it as provided for by paragraph 19.

Accordingly, the order of the Appellate Division should be reversed, without costs, the order of Supreme Court reinstated, and the certified question answered in the negative.

Judges CIPARICK, GRAFFEO, SMITH, PIGOTT and JONES concur; Chief Judge LIPPMAN taking no part.

Order reversed, etc.